

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNERGETICS USA, INC., | ) |
| | ) |
| Plaintiff | ) 08-CV- |
| | ) |
| v. | ) COMPLAINT |
| | ) |
| ALCON LABORATORIES, INC. and ALCON, INC., | ) JURY TRIAL DEMANDED |
| | ) |
| Defendants. | ) |

Plaintiff Synergetics USA, Inc. ("Synergetics") for its Complaint against Alcon Laboratories, Inc. and Alcon, Inc. (together, "Alcon") alleges on knowledge as to itself and otherwise on information and belief:

### NATURE OF THE ACTION

1. This is an action brought pursuant to the antitrust laws of the United States to restrain anti-competitive conduct by defendant Alcon and to remedy the damage suffered by Synergetics as a result of Alcon's illegal efforts to maintain and expand its monopoly power in the market for certain capital equipment used in vitreoretinal surgery into the markets for stand-alone light sources and for light pipes and other disposable equipment used in such surgery.

2. Alcon manufactures a piece of equipment known as a "vitrectomy machine" or "VIT machine," which is necessary for substantially all vitreoretinal surgeries. Alcon's VIT machine is called the Accurus® Surgical System. The Accurus® accounts for approximately 85% of the VIT machines used in the United States; nearly all the rest are made by Bausch & Lomb. The Accurus® retails for approximately $75,000 and represents a piece of capital equipment that hospitals and vitreoretinal surgical practices invest in to perform vitreoretinal surgery.

3. Vitreoretinal surgery is a type of eye surgery in which some or all of the

1

vitreous (a gelatinous substance filling the posterior segment of the eye) and associated tissue are removed to provide the surgeon with ready access to the interior wall of the posterior segment of the eye, enabling the surgeon to perform the needed repair or other procedure.  The vitreous and other fluid and tissue so removed are collected in a disposable container, referred to as a cassette, which is inserted into the VIT machine prior to each surgery. The cassette used with the Accurus® is patented by Alcon and is a proprietary piece of Alcon equipment. A disposable cassette is necessary for each vitreoretinal procedure that is performed.

4.  Following the vitrectomy portion of the surgery, the retinal surgeon will utilize a variety of instruments to make the needed repair to the eye.  The instruments used include picks, forceps, scrapers, and/or laser probes. While performing surgery the surgeon may also irrigate the eye and then aspirate the fluid used for that purpose using suction. The vitreoretinal surgeon also uses a light source to illuminate the interior of the eye while performing surgery. The VIT machine provides utility in many of these tasks, pumping irrigation fluid and providing suction for aspiration at surgeon-defined rates, as well as providing an illumination source for light delivery to the eye through an optic fiber, commonly called a light pipe. Tools inserted into the eye are connected to the VIT machine through tubing (in the case of irrigation and aspiration) or optical fibers (in the case of illumination light).

5.  For each vitreoretinal surgical procedure, the surgeon utilizes a number of disposable items, including the cassette for the VIT machine, as well as a vitrector, infusion fluid tubing, and such items as an anesthetizing syringe, temporary eye-incision plugs, a sterile VIT machine screen cover, and a light pipe for delivery of light from the VIT machine into the eye (collectively, "instruments and accessories"). Alcon sells its instruments and accessories prepackaged in single-surgery kits referred to as vitreoretinal packs, which sell under the trademark Total Plus® at retail for approximately $400.  The Total Plus® can also be purchased as part of a trademarked

Custom-Pak®, which consists of the standard Total Plus® kit and additional items selected by the doctor or hospital.

6.   The Custom-Pak® can be made to include nearly whatever instruments and accessories a particular doctor typically uses during a vitreoretinal surgery. Alcon assembles and sells such customized Custom-Paks® to the hospital or other facility in which that doctor regularly performs vitreoretinal surgery.   According to Alcon's website:

> Alcon's Custom-Pak® Surgical Packs contain a customized single-use surgical procedure tray and consumable products used by eye surgeons for specific ophthalmic procedures. Each individual Custom-Pak® tray is manufactured to the surgeon's unique specifications and contains virtually every item needed for a single surgery. Additionally, the materials are packed in the exact sequence requested by the surgeon to support the surgical procedure.

7.   The Total Plus® portion of the Custom-Pak®, which contains the indispensable disposable cassette, however, cannot be customized. It comes in three standard sizes, corresponding to the gauge of the instruments in the pack.  The Total Plus® includes an Alcon light pipe whether the doctor or hospital wants one or not.  That is, Alcon will not sell a Total Plus® pack in the United States without a light pipe included in it (or at least included in the price).

8.   Significantly, Alcon does not sell its disposable cassette as a stand-alone item in the United States.   As a result, in order to obtain the disposable cassette necessary for each and every vitrectomy surgery, a doctor or hospital must purchase a Total Plus® pack.  The Total Plus® pack always includes an Alcon light pipe.  This is so even though the Custom-Pak® format would seem designed to allow purchasers to select the items they wish to buy along with the disposable cassette.

9.   In 2004, Synergetics released a new stand-alone light source, trademarked the PHOTON (approx. $10,000 retail), for use in vitreoretinal surgery. The PHOTON safely delivered at least four times more light into the eye than prior illumination sources

(including Alcon's), thereby overcoming a problem vitreoretinal surgeons had long complained of.

10. After the release into the market of Synergetics' PHOTON light, Alcon introduced its stand-alone light, known as the Xenon (or as the High Brightness Illuminator).  In September 2006, Synergetics released its next generation stand-alone light source, the PHOTON II.  (The PHOTON and the PHOTON II are referred to herein, collectively, as the "PHOTON.")  Alcon has engaged in a variety of anti-competitive tactics to extend its virtual monopoly in the VIT machine market into the market for stand-alone light sources and other equipment used in vitreoretinal surgery.

11.  Among these tactics is Alcon's refusal to sell its disposable cassette or Total Plus® pack without including, and/or charging for, an Alcon light pipe.  Synergetics manufactures and sells a light pipe for use with the PHOTON machine.  The Synergetics light pipe is designed to deliver to the eye the enhanced illumination provided by the PHOTON; it also has excess capacity that can be used for additional functions.  Because of the enhanced illumination of the PHOTON, using the Alcon light pipe sold in the Total Plus® with the PHOTON light source can be dangerous.

12. At the time Synergetics introduced the PHOTON, Alcon's light pipes (approx. $70 retail) could not safely deliver the enhanced illumination provided by the PHOTON to the eye. Surgeons who had access to a PHOTON light source began to request Total Plus® packs be made excluding Alcon's light pipes. Alcon has either denied these requests or offered to sell the Total Plus® at the same price regardless of whether the Alcon light pipe was included. As a result, the required purchase of Alcon light pipes with its cassettes has made it uneconomical to use any other light pipe or light source no matter the technical or clinical advantage that might have been gained.

13. There is no rational reason or medical basis for requiring that the Alcon light source be used when using the Alcon VIT machine for a vitreoretinal surgery.

14. Because so many hospitals and retinal surgery practices own an Accurus® VIT

machine and must purchase Alcon cassettes for use with each vitreoretinal surgery performed, Alcon's requirement that purchasers of Alcon cassettes must also purchase Alcon's light pipes has the effect of discouraging surgeons and hospitals from buying Synergetics light pipes, but more significantly, from acquiring the PHOTON light source in the first place, even though the PHOTON is technologically superior to Alcon's light source and even though the PHOTON and its light pipe are entirely compatible with the Alcon VIT machine. By tying the purchase of the light pipe to the purchase of the cassette, Alcon in effect forces surgeons and hospitals to use an inferior light source and to buy an Alcon light pipe when they might otherwise prefer to buy a Synergetics light pipe that would allow them to use the PHOTON light source.

15. Alcon also engages in a variety of ancillary anti-competitive tactics, as described below, in order to sell its Xenon light source and its instruments and accessories.

16. As a result, Alcon has prevented Synergetics from selling a substantial number of PHOTON light sources, although in countries where Alcon does not engage in such tactics, the PHOTON has captured a substantially larger share of the market for stand-alone light sources used in vitreoretinal surgery than is the case in the United States.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this case arises under the laws of the United States, specifically 15 U.S.C. § 15, which authorizes private actions under the Sherman and Clayton Acts. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because plaintiff's state law claims are so related to its claims under the anti-trust laws that they form part of the same case or controversy.

18. This Court has personal jurisdiction over defendant Alcon because Alcon transacts business in New York.

19. Venue is proper in this Court pursuant to 15 U.S.C. §§ 15 and 22 because Alcon Laboratories, Inc. has an agent in this district and transacts business in this district.

## PARTIES

20. Plaintiff Synergetics USA, Inc. is a Delaware corporation with its principal place of business at 3845 Corporate Centre Drive, O'Fallon, MO 63368.

21. Synergetics is a publicly traded company with a market capitalization of about $90 million on annual revenue of about $50 million and employs about 350 people.  The company designs, manufactures and markets products in support of micro- or minimally-invasive surgical procedures. Synergetics' primary markets are related to surgeries within the medical specialties of otolaryngology (ear, nose and throat or ENT), neurology (the brain), and ophthalmology (the eye). Its products in all of these specialties generally fit within one of three categories: surgical instruments (reusable or disposable, and used during surgery for tissue manipulation); capital equipment (e.g., power sources for electrosurgical procedures, and illumination and laser sources); and surgical accessories (products generally making surgical procedures more convenient for the doctor).

22. Defendant Alcon Laboratories, Inc. ("Alcon Labs") is a Delaware corporation with its principal place of business at 6201 South Freeway, Fort Worth, TX 76134-2099.

23. Alcon Labs is the U.S. subsidiary of defendant Alcon, Inc., a Swiss company with its headquarters in Hünenberg, Switzerland.  Alcon, Inc. is a global commercial force in the eye care business, not only in the area of ophthalmic surgery, but also in consumer eye care products and pharmaceuticals.  According to the Alcon, Inc., website:

> It is estimated that aggregate sales in the global ophthalmic surgical market is valued at US$3.7 billion and growing at a rate of about 7 percent per year. These sales are largely comprised of products and equipment used during cataract, vitreoretinal and refractive surgeries. Sales of

Alcon's surgical product line were US$2.2 billion in 2006, and are expected to continue to grow at a rate of 8-10 percent per year - a growth fueled by new product introductions, global expansion and market share gains. . . . The market for vitreoretinal surgical products is approximately US$300 million worldwide.

24. Alcon maintains offices in 75 countries; its U.S. offices are located in Texas, California, Florida, West Virginia, and Pennsylvania.  Alcon sells its VIT machines, its Xenon light source, its light pipes and other instruments and accessories all over the United States, including in the State of New York and in this district.   As a result, Alcon is engaged in interstate commerce and its conduct as described herein affects interstate commerce within the meaning of the antitrust laws.

25. Alcon transacts business in New York and in this district in that it sells VIT machines, Total Plus® packs, Custom-Paks®, and other instruments and accessories in this district.  Alcon also sells its consumer products, including prescription and over-the-counter eye drops and solutions for use with contact lenses in the State of New York and in this district.

26. On information and belief, Alcon employs sales representatives in this district.

27. Alcon Labs is authorized to do business in New York and maintains an agent for service of process in this district.

## RELEVANT MARKETS

28. In the U.S., generally each of the medical specialties may be considered to have a market of its own. This is true because of the specialized knowledge and skills, and particularly the specialized tools, used within each such specialty that do not generally find cross-over use or sales into other specialties. Further, in the U.S. there are also subspecialties that may be considered distinct markets. For example, within the ophthalmology specialty, there is the sub-specialty related to surgery in the posterior (back) segment of the eye, primarily focused on the retina, which is termed vitreoretinal

surgery. Vitreoretinal surgery is used to treat a variety of conditions, for example, intraocular tumors, severe eye trauma, ocular complications of diabetes or sickle cell disease, and retinal conditions such as retinal detachment. Vitreoretinal surgery is distinct from the sub-specialties that concentrate on the anterior (front) segment of the eye, concerned essentially with that limited set of conditions and diseases related to the lens and cornea (e.g., refractive procedures such as Lasik, and cataract treatment). Surgeons in the vitreoretinal sub-specialty have been specially trained for the procedures they perform and almost never operate within the anterior portion of the eye.

29. Four markets, all pertaining specifically to vitreoretinal surgery, are relevant to this action: (a) the U.S. market for disposable cassettes compatible with the Alcon Accurus® VIT machine; (b) the U.S. market for all disposable cassettes used in vitreoretinal surgery; (c) the U.S. market for stand-alone light sources used in vitreoretinal surgery; and (d) the U.S. market for instruments and accessories, including light pipes, used in vitreoretinal surgery.

30. With respect to the first market, the U.S. market for disposable cassettes compatible with the Alcon Accurus® VIT machine, Alcon has a complete monopoly. The disposable cassette is a necessary part of each vitreoretinal surgical procedure. It is supplied sterile, so good practice requires that the hospital or surgeon must use a new cassette for each surgery. Moreover, due to proprietary and intellectual property protections secured by Alcon, once a hospital or retinal surgery practice owns an Accurus® VIT machine, it can only obtain the disposable cassettes necessary to use that machine from Alcon. At the current time, and at all times relevant to this action, there are no substitutes for the disposable cassette.

31. With respect to the second market, the U.S. market for all disposable cassettes used in vitreoretinal surgery, Alcon maintains monopoly power because of its 85% share of the market for VIT machines. Cassettes made by any other manufacturer are

not interchangeable with Alcon cassettes; each cassette works only with the specific machine for which it is designed. Thus, in order to switch to a different cassette, a hospital or surgeon would have to invest in a different manufacturer's VIT machine, at a retail cost of approximately $75,000. Because of the cost of the investment in the VIT machine, purchasers of Alcon cassettes cannot readily switch to any other cassette.

32. Synergetics and Alcon compete in the U.S. market for stand-alone light sources used in vitreoretinal surgery. Although a VIT machine can also provide a light source for such surgery, today, the light provided by a VIT machine is generally inferior to that provided by a stand-alone light source. Nor can light sources not specifically designed to provide light to the inside of the eye during vitreoretinal surgery be substituted for use in such procedures.

33. Synergetics and Alcon also compete in the U.S. market for instruments and accessories, including light pipes, used in vitreoretinal surgery. There are no substitutes for these instruments and accessories, in that only specialized instruments, designed for use in vitreoretinal surgery and for use with a VIT machine and/or a stand-alone light source, can be used in such procedures, because of the need for high-precision instruments designed for use inside the eye.

34. Synergetics and Alcon compete in many countries outside the U.S., including Japan, in the Japanese market for stand-alone light sources and in the Japanese market for instruments and accessories, including light pipes, used in vitreoretinal surgery.

## ALCON'S ANTI-COMPETITIVE BEHAVIOR

### Background

35. Synergetics was founded in 1992 by Gregg D. Scheller and Kurt Gampp. Beginning operations in Scheller's garage, Synergetics' early goal was to furnish retinal surgeons (*i.e.*, specialized ophthalmic surgeons) with U.S.-manufactured, high quality, precision-made microsurgical instruments. Up to that point, most vitreoretinal microsurgical instruments were ordered from European companies, which had

extensive experience in the precise, almost watch making-like, skills required to manufacture microsurgical instruments. Benefiting from the abundant creativity of U.S. surgeons, combined with modern manufacturing techniques, Synergetics found initial success.  Synergetics developed an expert group of instrument makers and a wealth of knowledge and experience that enabled it to respond to surgeons' needs, providing designs for implementing new ophthalmic surgical techniques.

36. Over the years, Synergetics' business expanded, first to include, in addition to ophthalmic instruments, fiber-optic illumination and laser delivery probes and sources, then, through a merger in 2005, to the relatively new specialties of ENT and neurology.

37. Alcon is a global company with core businesses focused in three areas: (a) ophthalmic surgical products; (b) ophthalmic pharmaceuticals; and (c) consumer vision care.  Alcon provides surgical products for use in both anterior ophthalmic surgery and also in posterior, or vitreoretinal, surgery. Alcon's website boasts that it "is the worldwide leader in ophthalmic surgical products, ranging from cataract and refractive surgery and intraocular lenses to surgeries requiring vitreoretinal systems, sutures, needles and knives" and that "[m]ore eye care professionals rely on our ocular surgical products than any other company in the world. "

38. For use in vitreoretinal surgery, Alcon makes the Accurus® machine, used by approximately 85% of vitreoretinal surgeons in the United States.  At an approximate retail price of $75,000, the Accurus® represents a capital investment for hospitals and ophthalmic surgery practices.  The machine is periodically updated with software or other enhancements.  Hospitals and ophthalmic surgery practices would not expect to replace their VIT machines until the machine becomes obsolete, which can take more than a dozen years.  Once a hospital or ophthalmic surgery practice owns an Alcon Accurus® VIT machine, it is essentially locked into that machine for ten years or more.

39. A disposable cassette is necessary for each vitrectomy surgery.  The cassette is specific to the VIT machine and only Alcon cassettes can be used with the Accurus® VIT

machine.   Alcon is the sole supplier of its patent-protected disposable cassette and without the insertion of a new disposable cassette before each surgical procedure, the Accurus® VIT machine will not run.  As a result, once a hospital or ophthalmic surgery practice owns an Alcon Accurus® VIT machine, it is essentially locked into purchasing Alcon disposable cassettes for as long as it owns the machine.

40. The stand-alone light source used in vitrectomy surgery is not specific to the VIT machine. As a result, owners of an Alcon Accurus® VIT machine could, in theory, select a stand-alone light source based on the merits and relative price of the product, without regard to whether it is manufactured by Alcon.

41. In addition to the stand-alone light source, other capital equipment used in vitreoretinal surgery, such as a laser, is not specific to the VIT machine.  As a result, owners of an Alcon Accurus® machine could, in theory, select a laser based on the merits and relative price of the product, without regard to whether it is manufactured by Alcon.

42. Similarly, the instruments and accessories, including the light pipe, used in vitreoretinal surgery are not specific to the VIT machine.  As a result, owners of an Alcon Accurus® VIT machine could, in theory, select instruments and accessories, including light pipes, based on the merits and relative price of the product, without regard to whether it is manufactured by Alcon.

43. Because the light pipe delivers light from the light source into the eye, it is important for surgeons to use the correct light pipe for any particular light source. Indeed, because the PHOTON light source is substantially brighter than Alcon's built-in Accurus® light source and delivers more light through a comparable light pipe than Alcon's Xenon light, the Alcon light pipe is not suited for use with the PHOTON. The light pipe is, however, to a large part ancillary to the light source – that is, the amount and quality of light delivered during the surgery is determined in the first instance by the light source. Because the light pipe is essentially the conduit for that light, the

amount of light delivered to the eye may also depend on the diameter of the optic fiber in the light pipe. All other things being equal, one would expect that surgeons would determine the desired clinical conditions under which they wish to operate, and from that perspective, select which light source and light pipe combination can provide the desired condition.

44. As described below, by forcing hospitals and ophthalmic surgery practices to buy the Alcon light pipe in order to obtain Alcon disposable cassettes, Alcon was able to reverse the direction of purchasing decisions and in effect force eye surgeons to use the Alcon light source, because they had to pay for the Alcon-compatible light pipes whether they used the Alcon light source or not.

**The PHOTON Breakthrough**

45. In March, 2004, Synergetics introduced the PHOTON stand-alone light source at a vitrectomy conference. The PHOTON represented a technological breakthrough and a major advance in the area of vitreoretinal surgery. The PHOTON was able safely to deliver at least four times more light into the eye than prior illumination sources. Additionally, the PHOTON could deliver that greater amount of light through a very small optic fiber, which could be inserted into the eye through a very small incision, enabling surgeons to illuminate the eye without creating a wound that required sutures to close.

46. In addition to providing illumination, and as a further advance in the art, the PHOTON also allows the surgeon to use a single optical fiber to deliver both illumination light and a treatment laser light into the eye. The PHOTON also offers the possibility of using "chandelier" lighting during vitreoretinal surgery.

47. The enhanced illumination levels offered by the PHOTON also allow vitreoretinal surgeons to use a smaller gauge light pipe during surgical procedures.

48. At the time Synergetics introduced the PHOTON, Alcon did not offer a comparable product. Nor could Alcon's light pipe deliver to the eye the extra

illumination provided by the PHOTON. The PHOTON thus represented a threat to Alcon's sales of light sources and light pipes.

49. Alcon went into a crash engineering project to improve the high-brightness illuminator it had been developing and had planned to introduce shortly. It began to engage in market-delaying activities and other anti-competitive conduct in an effort to leverage its market power in VIT machines and disposable cassettes to prevent competition in the markets for stand-alone light sources, light pipes, and other instruments and accessories.

50. At the small optic fiber size used by Synergetics, Alcon's Xenon light source still does not provide illumination at as great a level as that provided by the PHOTON, nor can a vitreoretinal surgeon integrate both illumination and laser light in a single optical fiber attached to the Alcon Xenon source.

**Alcon's Efforts to Preempt and Prevent Sales of the PHOTON Light**

51. As early as August, 2004, Alcon was engaging in anti-competitive conduct designed to interfere with sales of Synergetics' PHOTON light source. Alcon told customers that its Xenon light source would be on the market and available for purchase in September, 2004, although it knew this to be false. The purpose of this deception was to encourage customers to wait until Alcon's light source was available, rather than to buy the immediately available Synergetics PHOTON light.

52. Alcon sales representatives also began falsely to disparage the PHOTON light source, including telling vitreoretinal surgeons or other purchasing decision makers that the PHOTON (a) carried only a 90-day warranty; (b) had to be sent back to Synergetics to change the bulb; and (c) did not use optical filtering. None of these assertions was true.

53. Alcon also began to give away, for free, its new Xenon light source to customers who had not requested it and had never tried it. Alcon also began giving "grant" money to surgeons, hospitals, or ophthalmic surgery practices in order to

"encourage" these accounts to use the Xenon light source.

54. Alcon maintains a Clinical Advisory Board of hundreds of retina surgeons, out of a total U.S. population of about 2100 retina surgeons.  Usually the selected individual is the head or chief of the department or a group of surgeons, thereby giving Alcon the power to influence the entire group.  Frequently these surgeons (and sometimes their spouses or significant others) are flown to "meetings" with Alcon, at Alcon's expense.  Some of these surgeons have "consulting" contracts that exceed $100,000 per year.  At least one surgeon was publicly threatened with the loss of this arrangement unless he purchased Alcon products.

55. Alcon employs a market share rebate program that increases the rebate across the spectrum of Alcon products (including not only Alcon Total Plus® packs and Custom-Paks® but also pharmaceuticals and other Alcon products), according to the volume of Alcon products purchased.  This rebate program has the known and intended effect of driving customers toward Alcon's stand-alone light source, laser, and instruments and accessories, in that the customer can increase its rebate not only on such products, but on the broader range of Alcon products purchased.  Alcon has employed this rebate program to "remind" potential purchasers of Synergetics' competing light source, laser, and instruments and accessories that purchases of the Synergetics products could, among other things, increase the net price that customers pay for Alcon's unrelated products, such as pharmaceutical products.

56. Alcon has provided, on a stand-alone basis, free Alcon Xenon light sources and/or instruments and accessories to customers considering purchase of Synergetics' competing products.  In at least one instance, this conduct has resulted in a customer's decision not to purchase the Synergetics light source, which in turn significantly diminished, if not eliminated, all future sales of Synergetics instruments and accessories to that customer.

57. Likewise, Alcon has given away its Accurus® VIT machines to customers in

exchange for the customers' agreement to a long-term exclusive supply contract with Alcon for instruments and accessories, while charging higher prices for those instruments and accessories so as to cover or finance the "cost" of the VIT machine over a period of years.

58. Synergetics has been told by certain potential customers that they cannot purchase or even receive proposals on sales of Synergetics' products because they are "under contract with Alcon."

59. In 2006, Alcon hired Synergetics' National Sales Manager, Phil Biancalana. Mr. Biancalana possessed critical knowledge of Synergetics trade secrets across a broad spectrum of Synergetics' business, including sales volumes and relative market strength among Synergetics' products.  Alcon has used that knowledge to focus its vitreoretinal product development efforts on products that are directly competitive with Synergetics' best selling products.

60. More recently, Alcon approached Synergetics and demanded a license for Synergetics' laser probe patented technology.  Alcon threatened that if Synergetics did not provide such a license, Alcon would ensure that its new VIT machine, which it expects to release into the market shortly, which in all likelihood will be placed in 85-90% of domestic vitreoretinal surgery accounts, and which will have an integral laser source, will be incompatible with Synergetics' laser probe.

**Alcon's Unlawful Tying Arrangement**

61. By far the most successful, coercive and anti-competitive tactic Alcon has engaged in has been its refusal to sell its disposable cassette unless the purchaser also purchases a certain amount of Alcon instruments and accessories, including, in particular, the Alcon light pipe.

62. In the United States, Alcon does not offer its disposable cassette for sale outside of an Alcon Total Plus® pack.  Thus to obtain the disposable cassettes needed to operate the Accurus® machine, a purchaser must also buy additional Alcon products,

making it uneconomical for vitreoretinal surgeons to obtain instruments and accessories from anyone other than Alcon.

63. If hospitals and surgeons could purchase instruments and accessories separately from the disposable cassette, they could choose which instruments and accessories to buy based on the relative merits and relative prices of the competing products. Instead, because they must have the disposable cassette that only Alcon can provide, hospitals and vitreoretinal surgeons are coerced into buying Alcon instruments and accessories, including the Alcon light pipe, as well.

64. Alcon's refusal to sell its disposable cassette without an Alcon light pipe has particularly far-reaching effects.  A disposable light pipe is used in each and every vitreoretinal surgery.  Because vitreoretinal surgeons are required to purchase the Alcon light pipe whether they want it or not, and because the Alcon light pipe is not directly compatible with and does not take advantage of the PHOTON's superior technology, vitreoretinal surgeons are also coerced into using Alcon's light pipe and Alcon's Xenon light source.

65. Alcon's Total Plus® pack sells for approximately $400.  Surgeons who have asked for a Total Plus® without the Alcon light pipe have been told either that the Total Plus® is not available without the light pipe or that the cost of the Total Plus® is the same with or without the light pipe.

66. The Synergetics light pipe retails for approximately $70.  Surgeons who would prefer to use the Synergetics PHOTON light source have already paid for an incompatible Alcon light pipe and thus must pay an additional $70 per surgery if they wish to use the PHOTON light and the Synergetics light pipe.  If the Alcon light pipe were sold separate and apart from the disposable cassette, vitreoretinal surgeons could choose which light pipe – and which stand-alone light source – to use based on the relative merits and relative price of the competing products.

67. There is no reasonable basis and no pro-competitive justification for Alcon's

refusal to sell the disposable cassette without the light pipe and without various other instruments and accessories. The instruments and accessories, and the light pipe, are separate products from the disposable cassette, with separate functions and separate markets. Alcon is by far the dominant player in the VIT machine market and the vast majority of vitreoretinal surgeons use an Alcon VIT machine. There is no need, however, to use Alcon instruments and accessories or an Alcon light source in order to obtain the benefits of the Alcon VIT machine.

68. In some markets outside the United States, Alcon sells its vitrectomy pack, and its disposable cassette, without a light pipe, thus further demonstrating that there is no necessary connection between the cassette, on the one hand, and the light pipe, or the light source, on the other.

**Effects on Competition**

69. The above-described conduct has directly and proximately harmed competition in the market for stand-alone light sources and in the market for light pipes and instruments and accessories used in vitreoretinal surgery.

70. Synergetics' PHOTON light source represents a technological breakthrough and innovation in light sources for vitreoretinal surgery. Instead of competing with Synergetics either by matching Synergetics' technological innovation or by offering competitive prices, Alcon's conduct has coerced vitreoretinal surgeons to forego use of this breakthrough and to continue using an Alcon light source, regardless of whether that light source represents a better product or a better value for the money than Synergetics' light source.

71. Alcon's anti-competitive tactics threaten to drive Synergetics out of the market for stand-alone light sources, even though Synergetics provides a superior product. Alcon's anti-competitive tactics threaten to prevent *any* competitor from offering a stand-alone light source, because Alcon's dominance in the market for VIT machines provides it with the leverage to prevent competitors from selling light sources

that do not use the Alcon light pipe.

72. Although Alcon has given away its Xenon light source for free in order to prevent hospitals and/or retinal surgery practices from acquiring a PHOTON light from Synergetics, if Alcon succeeds in driving Synergetics out of the market for stand-alone light sources, it will be free to charge monopoly prices for its light source. Any other competitor would suffer the same fate, because Alcon's dominance in the market for VIT machines and disposable cassettes gives it the leverage and ability to coerce hospitals and retinal surgery practices to purchase an Alcon light source, rather than a light source from a competitor.

73. Alcon's anti-competitive tactics similarly affect competition in the market for light pipes and instruments and accessories. Alcon ties the purchase of the light pipe to the purchase of the disposable cassette in order to coerce hospitals and/or retinal surgery practices to use an Alcon light pipe. If Alcon succeeds in driving Synergetics out of the market for stand-alone light sources, it will be free to charge monopoly prices for its light pipe. Any other competitor would suffer the same fate, because Alcon's dominance in the market for VIT machines and disposable cassettes gives it the leverage and ability to coerce hospitals and retinal surgery practices to use Alcon light pipes, rather than light pipes from a competitor.

74. Alcon has used these anticompetitive tactics in countries outside the U.S. to the detriment of Synergetics. For instance, Alcon has recently begun to employ the same anti-competitive tactics in Japan. In Japan, however, Alcon ties not only the purchase of the light pipe to the purchase of the disposable cassette, but has refused in some instances to sell disposable cassettes without laser probes, even though laser probes are used in only about 30% of vitreoretinal procedures. Alcon's tactics in Japan have had similar effects on competition and on Synergetics' market share in Japan to what has occurred in the United States. This conduct has had a direct, substantial and reasonably foreseeable effect on Synergetics' exports to Japan.

**Synergetics' Damages**

75. Alcon's efforts to eliminate competition in the markets for stand-alone light sources and light pipes and instruments and accessories used in vitreoretinal surgery has directly and proximately harmed Synergetics, Alcon's primary competitor in these markets.

76. The financial harm to Synergetics that has resulted from Alcon's anti-competitive behavior is substantial. Synergetics has been prevented from selling its PHOTON light source to hospitals and/or retinal surgical practices that would otherwise have purchased it. Since the introduction of the Alcon Xenon light source, Synergetics' share of the market for stand-alone light sources has declined. Because of the technological superiority of the Synergetics PHOTON light source, in the absence of Alcon's anti-competitive tactics, Synergetics would have been able to capture a substantially larger share of the market for stand-alone light sources.

77. Synergetics has also been prevented from selling its light pipes and other instruments and accessories. For instance, in the absence of Alcon's anti-competitive tactics, Synergetics would have been able, on average, to sell more than a hundred light pipes and laser probes annually for every additional PHOTON light source it would have sold.

78. Synergetics has also suffered damage to its sales of other instruments and accessories. Users of the PHOTON light source, who purchase disposable cassettes from Alcon and light pipes from Synergetics, may choose their supplier for other instruments and accessories based on price and comparative value. In the absence of Alcon's anti-competitive tactics, Synergetics' share of the market for instruments and accessories used in vitreoretinal surgery would have been substantially larger.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

(Unlawful Tying in Violation of § 1 of the Sherman Act, 15 U.S.C. § 1)

79. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

80. The disposable cassette used in the VIT machine during vitreoretinal surgery and the instruments and accessories, including without limitation the light pipe, used during vitreoretinal surgery are separate and distinct products. They are sold in separate markets; their functions are different; and there is separate demand for them.

81. The disposable cassette used in the VIT machine during vitreoretinal surgery and the stand-alone light source used for illumination during vitreoretinal surgery are separate and distinct products. They are sold in separate markets; their functions are different; and there is separate demand for them.

82. Alcon requires purchasers who purchase disposable cassettes also to purchase instruments and accessories, including without limitation Alcon light pipes.

83. By requiring purchasers who purchase disposable cassettes also to purchase Alcon light pipes, Alcon in effect requires such purchasers to purchase the Alcon Xenon light source.

84. Alcon has sufficient market power in both the market for cassettes compatible with Alcon VIT machines and the market for disposable cassettes for use in VIT machines generally to restrain competition in the market for instruments and accessories, including, without limitation, light pipes, as a result of its tying arrangement.

85. Because of Alcon's market power in the market for cassettes compatible with Alcon VIT machines and its market power in the market for disposable cassettes for use in VIT machines generally, Alcon's restraint of competition in the market for instruments and accessories, including without limitation, light pipes, also has the effect

of restraining competition in the market for stand-alone light sources used in vitreoretinal surgery.

86. Alcon's tying arrangement affects a not insubstantial amount of interstate commerce in stand-alone light sources and instruments and accessories, including light pipes.

87. Alcon's tying arrangement is a *per se* violation of the anti-trust laws.

88. The purpose and effect of this tying is to prevent vitreoretinal surgeons from choosing on their merits among stand-alone light sources and among instruments and accessories, including light pipes, for use in vitreoretinal surgery and to restrain competition in those markets in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

89. There are no benefits from this tying that outweigh the harm to competition in those markets.

90. Alcon's anticompetitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

91. As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

92. Unless the activities complained of are enjoined, Synergetics will continue to suffer irreparable injury for which Synergetics is without an adequate remedy at law.

93. Synergetics' injury is of the type the antitrust laws are intended to prohibit and constitutes antitrust injury.

### SECOND CAUSE OF ACTION

(Unlawful Tying in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

94. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1

through 78 as if fully set forth herein.

95. The disposable cassette used in the VIT machine during vitreoretinal surgery and the instruments and accessories, including without limitation the light pipe, used during vitreoretinal surgery are separate and distinct products. They are sold in separate markets; their functions are different; and there is separate demand for them.

96. The disposable cassette used in the VIT machine during vitreoretinal surgery and the stand-alone light source used for illumination during vitreoretinal surgery are separate and distinct products. They are sold in separate markets; their functions are different; and there is separate demand for them.

97. Alcon requires purchasers who purchase disposable cassettes also to purchase instruments and accessories, including without limitation Alcon light pipes.

98. By requiring purchasers who purchase disposable cassettes also to purchase Alcon light pipes, Alcon in effect requires such purchasers to purchase and/or use the Alcon Xenon light source.

99. Alcon has sufficient market power in both the market for cassettes compatible with Alcon VIT machines and the market for disposable cassettes for use in VIT machines generally to restrain competition in the market for instruments and accessories, including, without limitation, light pipes, as a result of its tying arrangement.

100. Because of Alcon's market power in the market for cassettes compatible with Alcon VIT machines and its market power in the market for disposable cassettes for use in VIT machines generally, Alcon's restraint of competition in the market for instruments and accessories, including without limitation, light pipes, also has the effect of restraining competition in the market for stand-alone light sources used in vitreoretinal surgery.

101. Alcon's tying arrangement affects a not insubstantial amount of interstate commerce in stand-alone light sources and instruments and accessories, including light

pipes.

102.    Alcon's tying arrangement is a *per se* violation of the anti-trust laws.

103.    The purpose and effect of this tying is to prevent vitreoretinal surgeons from choosing on their merits among stand-alone light sources and among instruments and accessories, including light pipes, for use in vitreoretinal surgery and to restrain competition in those markets in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

104.    There are no benefits from this tying that outweigh the harm to competition in those markets.

105.    Alcon's anticompetitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

106.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

107.    Unless the activities complained of are enjoined, Synergetics will continue to suffer irreparable injury for which Synergetics is without an adequate remedy at law.

108.    Synergetics' injury is of the type the antitrust laws are intended to prohibit and constitutes antitrust injury.

**THIRD CAUSE OF ACTION**

(Unlawful Tying in Violation of § 3 of the Clayton Act, 15 U.S.C. § 14)

109.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

110.    The disposable cassette used in the VIT machine during vitreoretinal surgery and the instruments and accessories, including without limitation the light pipe, used during vitreoretinal surgery are separate and distinct products.  They are

sold in separate markets; their functions are different; and there is separate demand for them.

111.    The disposable cassette used in the VIT machine during vitreoretinal surgery and the stand-alone light source used for illumination during vitreoretinal surgery are separate and distinct products.  They are sold in separate markets; their functions are different; and there is separate demand for them.

112.    Alcon requires purchasers who purchase disposable cassettes also to purchase instruments and accessories, including without limitation Alcon light pipes.

113.    By requiring purchasers who purchase disposable cassettes also to purchase Alcon light pipes, Alcon in effect requires such purchasers to purchase and/or use the Alcon Xenon light source.

114.    Alcon has sufficient market power in both the market for cassettes compatible with Alcon VIT machines and the market for disposable cassettes for use in VIT machines generally to restrain competition in the market for instruments and accessories, including, without limitation, light pipes, as a result of its tying arrangement.

115.    Because of Alcon's market power in the market for cassettes compatible with Alcon VIT machines and its market power in the market for disposable cassettes for use in VIT machines generally, Alcon's restraint of competition in the market for instruments and accessories, including without limitation, light pipes, also has the effect of restraining competition in the market for stand-alone light sources used in vitreoretinal surgery.

116.    Alcon's tying arrangement affects a not insubstantial amount of interstate commerce in stand-alone light sources and instruments and accessories, including light pipes.

117.    Alcon's tying arrangement in effect constitutes a condition that purchasers of Alcon's disposable cassettes not use instruments and accessories, in particular light

pipes, of a competitor and a further condition that purchasers of Alcon's disposable cassettes not use stand-alone light sources of a competitor, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

118.    Alcon's tying arrangement is a *per se* violation of the anti-trust laws.

119.    The purpose and effect of this tying is to prevent vitreoretinal surgeons from choosing on their merits among stand-alone light sources and among instruments and accessories, including light pipes, for use in vitreoretinal surgery and to restrain competition in those markets in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

120.    There are no benefits from this tying that outweigh the harm to competition in those markets.

121.    Alcon's anticompetitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

122.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

123.    Unless the activities complained of are enjoined, Synergetics will continue to suffer irreparable injury for which Synergetics is without an adequate remedy at law.

124.    Synergetics' injury is of the type the antitrust laws are intended to prohibit and constitutes antitrust injury.

### FOURTH CAUSE OF ACTION

(Monopolization of Stand-Alone Light Source Market in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

125.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

126.    Alcon possesses monopoly power in the market for stand-alone light sources used during vitreoretinal surgery. Significant entry barriers characterize that market.

127.    Through the anti-competitive conduct described above, Alcon has willfully obtained and maintained that power by anti-competitive and unreasonably exclusionary conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Unless restrained by the Court, Alcon will continue to unlawfully maintain its monopoly power causing irreparable and continuing harm to Synergetics, for which Synergetics has no adequate legal remedy.

128.    Alcon's anti-competitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

129.    Alcon has acted with the specific intent to obtain and maintain its monopoly power, and its illegal conduct has enabled it do so.

130.    Alcon's conduct occurred in and affected interstate commerce.

131.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of 15 U.S.C. § 2, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

132.    Unless the activities complained of are enjoined, Synergetics will suffer irreparable injury for which Synergetics is without an adequate remedy at law.

133.    Synergetics' injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

### FIFTH CAUSE OF ACTION

(Attempted Monopolization of Stand-Alone Light Source Market in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

134.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1

through 78 as if fully set forth herein.

135.    Alcon has willfully engaged, and is engaging, in a course of conduct, including tying, giving away Xenon stand-alone light sources, and refusals to deal, among other acts, in order to obtain a monopoly in the stand-alone light source market, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, if it has not already done so.

136.    Alcon's anticompetitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

137.    Alcon has acted with a specific intent to monopolize and destroy effective competition in the market for stand-alone light sources used in vitreoretinal surgery.

138.    Alcon's continuing conduct has occurred in and affected interstate commerce.

139.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

140.    Unless the activities complained of are enjoined, Synergetics will suffer irreparable injury for which Synergetics is without an adequate remedy at law.

141.    Synergetics' injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

### SIXTH CAUSE OF ACTION

(Monopolization of Market for Instruments and Accessories in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

142.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

143.    Alcon possesses monopoly power in the market for instruments and accessories used during vitreoretinal surgery.  Significant entry barriers characterize that market.

144.    Through the anti-competitive conduct described above, Alcon has willfully obtained and maintained that power by anti-competitive and unreasonably exclusionary conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Unless restrained by the Court, Alcon will continue to unlawfully maintain its monopoly power causing irreparable and continuing harm to Synergetics, for which Synergetics has no adequate legal remedy.

145.    Alcon's anti-competitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

146.    Alcon has acted with the specific intent to obtain and maintain its monopoly power, and its illegal conduct has enabled it do so.

147.     Alcon's continuing conduct has occurred in and affected interstate commerce.

148.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

149.     Unless the activities complained of are enjoined, Synergetics will suffer irreparable injury for which Synergetics is without an adequate remedy at law.

150.     Synergetics' injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

SEVENTH CAUSE OF ACTION

(Attempted Monopolization of Market for Instruments and Accessories in Violation of
§ 2 of the Sherman Act, 15 U.S.C. § 2)

151.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

152.     Alcon has willfully engaged, and is engaging, in a course of conduct, including tying, giving away Xenon stand-alone light sources, and refusals to deal, among other acts, in order to obtain a monopoly in the market for instruments and accessories used in vitreoretinal surgery, including without limitation, light pipes, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, if it has not already done so.

153.     Alcon's anticompetitive acts have harmed consumers of their products – vitreoretinal surgeons, hospitals, and retinal surgery practice groups -- and competition.

154.     Alcon has acted with a specific intent to monopolize and destroy effective competition in the market for instruments and accessories used in vitreoretinal surgery, including without limitation, light pipes.

155.     Alcon's continuing conduct has occurred in and affected interstate commerce.

156.     As a direct, foreseeable, and proximate result of Alcon's conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

157.     Unless the activities complained of are enjoined, Synergetics will suffer irreparable injury for which Synergetics is without an adequate remedy at law.

158.     Synergetics' injury is of the type the antitrust laws are intended to prohibit

and thus constitutes antitrust injury.

### EIGHTH CAUSE OF ACTION

(Predatory Pricing of Stand-Alone Light Source in Violation of 15 U.S.C. § 13a)

159.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

160.    Alcon has given its Xenon light source to certain hospitals and/or retinal surgery practices for free for the purpose of preventing such hospitals and/or practices from purchasing a PHOTON light source from Synergetics.

161.    Alcon provided its stand-alone light source, the Xenon light, to certain hospitals and/or retinal surgery practices at unreasonably low prices – including at times charging nothing for the light source – for the purpose of destroying competition in the market for stand-alone light sources and in the market for light pipes and other instruments and accessories used in vitreoretinal surgery, in violation of 15 U.S.C. § 13a.

162.    Alcon provided its stand-alone light source, the Xenon light, to certain hospitals and/or retinal surgery practices at unreasonably low prices – including at times charging nothing for the light source – for the purpose of eliminating Synergetics as a competitor in the market for stand-alone light sources and in the market for light pipes and other instruments and accessories used in vitreoretinal surgery, in violation of 15 U.S.C. § 13a.

163.    Alcon's continuing conduct has occurred in and affected interstate commerce.

164.    As a direct, foreseeable, and proximate result of Alcon's conduct in violation of 15 U.S.C. § 13a, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

165.    Unless the activities complained of are enjoined, Synergetics will suffer

irreparable injury for which Synergetics is without an adequate remedy at law.

166.    Synergetics' injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

### NINTH CAUSE OF ACTION

(Predatory Pricing of Light Pipes in Violation of 15 U.S.C. § 13a)

167.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

168.    Alcon charges the same price for a Total Plus® pack that includes an Alcon light pipe as it charges for one that does not include an Alcon light pipe.  As a result, Alcon in effect gives the light pipe away for free, because purchasers of the Total Plus® do not pay any more to purchase a light pipe.

169.    Alcon provides the light pipe without charge in order to prevent or discourage hospitals and/or retinal surgery practices from purchasing a light pipe from any of Alcon's competitors and, relatedly, to prevent or discourage such hospitals and/or practices from purchasing a light source from any of Alcon's competitors.

170.    Alcon provides its light pipe to certain hospitals and/or retinal surgery practices at unreasonably low prices – including charging nothing for the light pipe – for the purpose of destroying competition in the market for light pipes and instruments and accessories used in vitreoretinal surgery, and, relatedly, in the market for stand-alone light sources, in violation of 15 U.S.C. § 13a.

171.    Alcon provides its light pipe to hospitals and retinal surgery practices at unreasonably low prices – including charging nothing for the light pipe by pricing the Total Plus® at the same price regardless of whether a light pipe is included or not – for the purpose of eliminating Synergetics as a competitor in the market for light pipes and other instruments and accessories used in vitreoretinal surgery, and in the market for stand-alone light sources, in violation of 15 U.S.C. § 13a.

172.    Alcon's continuing conduct has occurred in and affected interstate

commerce.

173.     As a direct, foreseeable, and proximate result of Alcon's conduct in violation of 15 U.S.C. § 13a, Synergetics has been and will continue to be damaged by, without limitation, lost sales of Synergetics' PHOTON light source and lost sales of instruments and accessories, including light pipes, and a diminution in value to Synergetics' trademarks, reputation, and goodwill in amounts to be proven at trial.

174.     Unless the activities complained of are enjoined, Synergetics will suffer irreparable injury for which Synergetics is without an adequate remedy at law.

175.     Synergetics' injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

### TENTH CAUSE OF ACTION

(Injurious Falsehood/Business Disparagement)

176.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

177.     In or about February, 2005, Alcon made false statements to certain vitreoretinal surgeons about the PHOTON light source, including that the PHOTON (a) carried only a 90-day warranty; (b) had to be sent back to Synergetics to change the bulb; and (c) did not use optical filtering.  None of these assertions was true.

178.     Alcon intended that these statements would result in harm to Synergetics' commercial and pecuniary interests.

179.     Alcon knew that these statements were false or acted with reckless disregard of for the truth or falsity of the statements.

180.     Synergetics suffered pecuniary damage to its commercial interests as a result of Alcon's injurious falsehoods.

181.     By reason of the foregoing, Alcon is liable to Synergetics for injurious falsehood in an amount to be proved at trial.

## ELEVENTH CAUSE OF ACTION

### (Tortious Interference with Contract)

182.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if fully set forth herein.

183.    Synergetics entered into a contract with Phil Biancalana, who was the company's National Sales Manager. Pursuant to that contract, Biancalana was prohibited from disclosing Synergetics' confidential business information and trade secrets acquired during the course of his employment, even after leaving that employment.

184.    In 2006, Alcon hired Biancalana.

185.    Alcon had knowledge of Biancalana's contract with Synergetics and, in particular, of the term of the contract that prohibited Biancalana from disclosing Synergetics' confidential information and trade secrets.

186.    Biancalana has breached his contract with Synergetics by disclosing to Alcon Synergetics' confidential information and trade secrets, including information about sales volumes and relative market strength among Synergetics' products.

187.    Alcon intentionally induced Biancalana's breach of his contract with knowledge that Biancalana was contractually prohibited from disclosing Synergetics' confidential information and trade secrets.

188.    Alcon induced Biancalana to breach his contract with Synergetics improperly, tortiously, and without justification, for the purpose of harming Synergetics' business.

189.    Alcon has used the knowledge it improperly obtained to focus its vitreoretinal product development efforts on products that are directly competitive with Synergetics' best selling products.

190.    Synergetics has been harmed in its business and has suffered damages as a result.

191.    By reason of the foregoing, Alcon is liable to Synergetics for tortious interference with the contract between Synergetics and Biancalana, in an amount to be proven at trial.

WHEREFORE Synergetics requests that the Court enter judgment against Alcon:

A.  Adjudging and decreeing that Alcon: (i) unlawfully tied the sale of Alcon light pipes and other instruments and accessories to the sale of Alcon disposable cassettes, in violation of 15 U.S.C. §§ 1, 2, and 14; (ii) unlawfully obtained and maintained a monopoly in the market for stand-alone light sources used in vitreoretinal surgery, in violation of 15 U.S.C. § 2; (iii) unlawfully attempted to monopolize the market for stand-alone light sources used in vitreoretinal surgery, in violation of 15 U.S.C. § 2; (iv) unlawfully obtained and maintained a monopoly in the market for instruments and accessories used in vitreoretinal surgery, in violation of 15 U.S.C. § 2; (v) unlawfully attempted to monopolize the market for instruments and accessories used in vitreoretinal surgery, in violation of 15 U.S.C. § 2; (vi) is liable to Synergetics for injurious falsehood/business disparagement causing pecuniary damage to Synergetics' commercial interests in an amount to be proved at trial; and (vii) is liable to Synergetics for tortious interference with contract in an amount to be proved at trial;

B.  Enjoining Alcon from:  (i) tying the sale of Alcon light pipes and other instruments and accessories to the sale of Alcon disposable cassettes; (ii) refusing to sell its disposable cassette by itself, without a required purchase of a light pipe or other instruments or accessories; (iii) engaging in predatory pricing with respect to its Xenon light source; (iv) engaging in predatory pricing with respect to its light pipe;  and (v) falsely disparaging Synergetics and the PHOTON light source;

C.  Awarding Synergetics its actual damages in an amount to be proved at trial,

with that portion of the damages arising from Alcon's violations of the anti-trust law trebled pursuant to 15 U.S.C. § 15, along with interest on the total amount of damages;

D. Awarding Synergetics its costs of this lawsuit, including attorneys' fees, as provided in 15 U.S.C. § 15; and

E. Awarding such other and further relief as this Court deems just and proper.

Dated:    April 16, 2008

HANLY CONROY BIERSTEIN SHERIDAN FISHER
& HAYES LLP

By: _____

Paul J. Hanly, Jr.
phanly@hanlyconroy.com
Andrea Bierstein
abierstein@hanlyconroy.com
112 Madison Ave., 7th Floor
New York, New York 10016
Tel:  (212) 784-6401 (PJH)
Tel:  (212) 784-6403 (AB)
Fax:  (212) 213-5949

*Of counsel:*
Derek Y. Brandt
dbrandt@simmonscooper.com
Emily J. Kirk
ekirk@simmonscooper.com
SIMMONSCOOPER LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
Tel: (618) 259-2222
Fax: (618) 259-2251